813 F.Supp. 1402 (1993)
PEABODY HOLDING COMPANY, INC., et al., Plaintiffs,
v.
COSTAIN GROUP PLC, et al., Defendants.
No. 4:92CV 2292 SNL.
United States District Court, E.D. Missouri, E.D.
February 23, 1993.
*1403 *1404 Michael J. Morris, Michael D. O'Keefe, W. Stanley Walch, Thompson and Mitchell, St. Louis, MO, for plaintiffs.
Glenn E. Davis, Frank N. Gundlach, Mary C. Kickham, Armstrong and Teasdale, St. Louis, MO, Michael Rowe Feagley, Priscilla Peterson Weaver, Michele Louise Odorizzi, Robert W. Quinn, Jr., Mayer and Brown, Chicago, IL, for defendants.
Alan E. Popkin, David W. Sobelman, Husch and Eppenberger, St. Louis, MO, for Altus Finance S.A.

MEMORANDUM
LIMBAUGH, District Judge.
This matter is before the Court upon plaintiffs' Motion for Permanent Injunction and defendants' Motion to Modify or Dissolve this Court's Preliminary Injunction Order. Plaintiffs initiated the above-styled cause by filing a six-count Complaint alleging that defendants: (1) breached contracts between plaintiffs and defendants; (2) tortiously interfered with the contracts; (3) tortiously interfered with plaintiffs' prospective economic advantage; and (4) defrauded plaintiffs under the common law. Additionally, plaintiffs sought application of the doctrines of specific performance and promissory estoppel.

I. FINDINGS OF FACT

A. Preliminary Background
There are two plaintiffs and four defendants remaining in this action. Plaintiff Peabody Resources, Limited (hereinafter "Peabody UK") is a corporation organized under the laws of England and Wales and is a subsidiary of Hanson PLC. Plaintiff Peabody Holding Company, Inc. (hereinafter "Peabody USA") is a New York corporation with its principal place of business in St. Louis and is also a subsidiary of Hanson PLC.
*1405 Defendants are Costain Group PLC (hereinafter "Costain"); Costain America, Inc. (hereinafter "CAI"); Richard Costain (Holdings) Limited (hereinafter "Holdings"); and Peter Costain (hereinafter "Mr. Costain"). Altus Finance S.A., a corporation organized and existing under the laws of France and owned 67% by Credit Lyonnais S.A. and 33% by Thomson Group S.A., was dismissed from the cause in December, 1992 for lack of personal jurisdiction. Defendant Costain is a public limited company organized and existing under the laws of England and Wales. Defendant Mr. Costain, the Chief Executive of Costain, is an Australian subject who resides in London, England. Defendant Holdings, a subsidiary of Costain, is a corporation organized under the laws of England and Wales. Holdings indirectly owns all of the shares of Costain Resources Limited (hereinafter "CRL"), an Australian Corporation that owns and operates Costain's Australian coal business. Defendant CAI, a subsidiary of Costain, is a corporation organized and existing under the laws of Delaware with its principal place of business in Chicago.
On October 19, 1992 Costain and Peabody UK entered into a written conditional Share Purchase Agreement which contemplated that, if Costain's shareholders and lenders approved, Costain's Australian coal business would be sold to Peabody UK for $200 million and other consideration. That Share Purchase Agreement contained a so-called "fiduciary out" provision (§ 4.1(d)) which provided that in certain specified circumstances and for a $5 million payment to Peabody, Costain could sell that Australian coal business to another buyer instead of Peabody. On November 6, 1992, Costain entered into a second conditional Share Purchase Agreement with an Altus subsidiary which contemplated that, if Costain's shareholders and lenders approved, Costain would sell its Australian coal business and its Australian commercial real estate to that Altus subsidiary for $245 million and other consideration. Peabody then filed this cause alleging breach of the October 19, 1992 Share Purchase Agreement (along with other claims) and seeking specific performance of the Agreement.

B. Procedural History
Peabody filed this suit on November 9, 1992 in the Circuit Court of the City of St. Louis. On November 13, 1992, the Costain defendants removed the case to this Court. On December 1, 1992, the Court denied plaintiffs' Motion to Remand. On December 11, 1992, this Court granted Altus' Motion to Dismiss for Lack of Personal Jurisdiction, but denied the Costain defendants' Motions to Dismiss for Lack of Personal Jurisdiction and Forum non Conveniens. 808 F.Supp. 1425
On December 15, 1992, plaintiffs filed a Motion for a Temporary Restraining Order. The Court set an expedited discovery schedule and scheduled and held an evidentiary hearing on that motion on December 28-29. Costain voluntarily postponed the closing of the Altus transaction from December 22, 1992 to December 30, 1992. Upon defendants' motion, this Court treated plaintiffs' motion as a motion for a preliminary injunction so that either party could immediately appeal an adverse decision. On December 30, 1992, the Court issued a preliminary injunction enjoining the scheduled closing of the Altus transaction pending further hearing. Defendants immediately filed a Notice of Appeal with the Court of Appeals for the Eighth Circuit. The Court of Appeals denied defendants' Motion for an Emergency Stay Pending Appeal on January 31, 1992. Peabody was later required to post $16 million bond.
During the period between December 30 and January 19, 1993, the parties conducted further written and oral discovery. On January 14, 1993, the Eighth Circuit Court of Appeals issued an Order stating that the Court of Appeals remanded the matter to this Court, with jurisdiction retained by the Eighth Circuit, for the limited purpose of allowing this Court to: "(a) consider and rule on any motions to modify or dissolve the preliminary injunction or bond; and (b) consider and rule on plaintiffs' motion for permanent injunctive relief or any other *1406 motion that is filed seeking a ruling on the merits of the case." On January 15, plaintiffs unconditionally agreed to extend their promise to go forth with the Peabody Share Purchase Agreement through February 28, 1993. The permanent injunction hearing was held over eight days, between January 19-22 and January 25-28, 1993.

C. Facts
In May, 1992, Costain publicly announced that it was contemplating the flotation or public offering of 49% of CRL. In response, Irl F. Englehardt, Chief Executive Officer of Peabody USA, telephoned Mr. Costain on or about June 26, 1992, to inquire whether Costain might be interested in selling Costain Coal, Inc. (hereinafter "CCI"), Costain's United States coal operation. Mr. Englehardt also expressed an interest in CRL. Mr. Costain responded that the Costain Board had already considered the issue and authorized him to hire Goldman, Sachs & Co. (hereinafter "Goldman") and to provide information to potential buyers. Mr. Costain told Mr. Englehardt to call Eric Grubman at Goldman to obtain information about the U.S. coal assets.
In July, negotiations between Peabody and Costain commenced. Jack Lushefski, Chief Finance Officer for Peabody, was the principal business negotiator for Peabody. Peter Hill, Head of Corporate Development for Costain, was the principal business negotiator for Costain. Before receiving any information, Peabody signed a confidentiality agreement, dated July 2, 1992, in which Peabody agreed to keep confidential whatever non-public information Costain disclosed to it. Def.Ex.TT. Mr. Lushefski testified that on July 9, 1992, Mr. Lushefski and Thomas H. Parker, a principal negotiator for Costain, reached a confidentiality agreement with regards to information provided by Peabody to Costain. Later in July, Costain agreed to supply information to Peabody concerning its Australian coal assets as well. The July 2 confidentiality agreement was amended to include that information also. Def.Ex.TT. In July, Peabody embarked on an extensive due diligence investigation of Costain's U.S. and Australian coal assets, including a trip to Australia.
From August 31 to September 2, Peabody and Costain met in St. Louis and discussed in detail Peabody's proposed acquisition of Costain's Australian and U.S. coal assets. On September 3, 1992, Mr. Englehardt, for Peabody, forwarded a letter to Goldman with two non-binding term sheets attached: one for the Australian properties and one for the U.S. properties. Pl.Ex. 2. Mr. Englehardt's letter stated that those term sheets "outline the general provisions to be included in the two purchase agreements" and were not "intended to be a firm offer or commitment by Peabody...." Pl.Ex. 2.
On the same day, Mr. Hill, for Costain, responded in writing to Mr. Englehardt's letter. Pl.Ex. 1. Mr. Hill's letter stated in the fourth paragraph:
So long as good faith negotiations between the parties for the combined purchase of the Australian and American coal holdings are continuing, Costain agrees to exclusively negotiate with Peabody. During such period, Costain will not (i) engage in any efforts to sell its Australian or American coal holdings by trade sale; (ii) solicit any offers from third parties for such holdings; (iii) provide information to or hold discussion with other potential purchasers; or (iv) issue a prospectus for the Australian coal business or make an offering of CRL shares. Without limiting the circumstances under which good faith negotiations may be terminated or deemed no longer to be continuing, it is our mutual understanding that Costain may terminate such negotiations if no binding agreement with respect to the Australian holdings has been executed by September 21, 1992, in which event this paragraph shall be of no further effect.
Pl.Ex. 1. The letter went on to state that the fourth paragraph was the only part of the letter which created any legally binding obligations on Costain. Pl.Ex. 1.
On September 18, 1992, Mr. Englehardt called Mr. Costain to discuss the status of *1407 the negotiations. In that conversation, Mr. Englehardt advised Mr. Costain that the proposed September 21 deadline for signing a binding agreement to purchase the Costain Australian coal operations was not achievable. Mr. Costain testified that he agreed to extend Peabody's exclusive negotiating rights for a period of nine days, until September 30. He further testified that during that September 18 conversation, Mr. Englehardt agreed to signing a definitive purchase agreement on September 30, when Mr. Englehardt planned to be in London. Mr. Englehardt testified that the parties were attempting to sign such a purchase agreement by September 30, although it seemed unlikely because of the shortness of time.
On September 21, 1992, Mr. Englehardt and Mr. Costain spoke on the telephone. Mr. Englehardt testified that during that conversation, Mr. Costain agreed to extend exclusivity indefinitely, so long as good faith negotiations were proceeding for the purchase of the Australian coal assets. Mr. Costain testified that in the telephone conversation, he reiterated that Costain would extend exclusivity only until September 30. No purchase agreement was reached by September 30, although the parties continued working in that direction.
On October 3, 1992, Mr. Costain and Thomas Slee, Finance Director of Costain, met with representatives of Bouygues, a French construction firm, to discuss a possible acquisition of the whole Costain Group by Bouygues. Bouygues was represented by Credit Lyonnais Securities (hereinafter "CLS"), and in particular, by Jean-Luc Biamonti, head of mergers and acquisitions at CLS. Mr. Costain provided Bouygues with a complete set of documents describing all of Costain's businesses, including its property, housing, land holdings, engineering and construction operations, as well as information concerning U.S. coal operations and the draft prospectus prepared for the CRL float describing the Australian assets. Mr. Costain further explained that by the time any transaction with Bouygues would be completed, Costain would in all likelihood no longer own its Australian coal assets. Mr. Costain informed the Bouygues representatives, including Mr. Biamonti, that Costain had been negotiating with another party for the sale of the Australian assets, that exclusivity had expired or was about to expire, and that no definitive sales agreement had yet been reached. Mr. Costain further informed the representatives of a $200 million future sale price for the Australian assets. On October 6, Mr. Costain learned that Bouygues had decided not to proceed with the discussions concerning a possible acquisition of Costain. Mr. Biamonti called Mr. Costain on October 7 and said he was disappointed that the transaction with Bouygues would not proceed.
During that phone conversation, Mr. Biamonti stated that he knew of a very interested potential buyer for the Australian coal assets. He did not identify the party. Mr. Costain responded that he would have to think about it and call Mr. Biamonti back. Mr. Costain later telephoned Mr. Biamonti on October 7 and told him that the party with whom Costain was already negotiating had been given exclusivity, but that exclusivity had lapsed on September 30 and Costain was going to confirm that fact in writing. Mr. Costain authorized Mr. Biamonti to release the draft CRL prospectus to his client and said that he would be available to meet with the client the next day. Mr. Biamonti's client turned out to be Altus.
Also on October 7, Mr. Hill delivered to Mr. Lushefski a letter written to Mr. Englehardt. Pl.Ex. 12. In that letter, Mr. Hill stated that since the parties were no longer discussing a transaction involving the combined purchase of the Australian and American coal holdings, the provisions of the fourth paragraph of the previous letter were no longer in effect. Pl.Ex. 12. The letter went on to state:
There is now no "exclusivity" with respect to either the American or the Australian properties. This is also consistent with Peter Costain's telephone conversation with you in which he stated that exclusivity with regard to the Australian transaction would only continue until September 30, 1992.
*1408 Pl.Ex. 12. The next day, October 8, Mr. Englehardt wrote Mr. Hill a letter in which he disagreed with Mr. Hill's statement that exclusivity had terminated. Pl.Ex. 13. Mr. Englehardt stated in the letter:
During my telephone conversation with Peter Costain on September 18, 1992, he agreed that we would continue to have "exclusivity" on Costain's Australian coal operations as long as the parties were engaged in good faith negotiations because we both realized that the September 30th target was no longer realistic.
Pl.Ex. 13.
Mr. Hill responded in a letter which he hand-delivered the next day, October 9. Pl. Ex. 14. The letter states:
Costain disagrees with the position taken in the final paragraph of your letter. I have confirmed with Peter Costain that he did not agree to any continuing "exclusivity" beyond September 30.

* * * * * *
In any event, we have now clarified that there is no "exclusivity", and that there will be no "exclusivity" prior to any execution of a definitive Agreement.
Pl.Ex. 14.
On October 8, Mr. Costain met with Claude-Eric Paquin of Altus and Mr. Biamonti and one of his colleagues from CLS. Paquin's purpose was to persuade Mr. Costain that Altus had an interest in the Australian coal assets and was prepared to move quickly to make a formal detailed offer. At the October 8 meeting, Mr. Costain gave Altus a full copy of the draft prospectus that had been prepared for the CRL flotation. Mr. Biamonti's attempts to fax Altus a copy of that prospectus on October 7 had been unsuccessful. Costain did not inform Peabody that it had met with Altus on October 8. On or after October 8, Costain personnel provided information to Altus and CLS to help them to understand and supplement the information in the draft prospectus.
On October 16, Altus informed Costain that it was prepared to pay $210 or $215 million for the Australian coal assets and to negotiate through the weekend. A few hours later, Mr. Costain directed Mr. Grubman of Goldman to notify Peabody that it had a competitor. As instructed, on October 16, Mr. Grubman informed Mr. Lushefski and Mark Alexander that Costain had received a higher bid from a party who was prepared to pay $210 million. Mr. Lushefski responded by saying that Peabody believed that it still had exclusive negotiating rights and that if Costain sold the Australian coal assets to another party, Peabody would sue Costain all over the world. Over the weekend of October 16-18, Costain continued negotiating with Altus. At the same time, Costain was negotiating with Peabody in London.
On Monday, October 19, Mr. Grubman of Goldman had a series of telephone conversations with Costain and representatives of Peabody and its parent, Hanson. The conversations were much like that of October 16. Mr. Grubman said that Costain was prepared to move forward with Peabody if Peabody raised its offer, but was prepared to move forward with the other party at $215 million if Peabody did not. Both Peabody and Hanson were upset, threatened litigation and refused to raise their price. By October 19, Costain had finally "agreed all matters" with Peabody, and the contract was ready to be signed. Costain, I Tr. at 297. The Altus negotiations, however, were still not concluded; the "contract still had work to be done on it." Costain, I Tr. at 297. Richard Hall, Costain's external solicitor, explained during the hearing that "there remain[ed] a number of important points still to be resolved" with Altus, not the least of which was the structure of the agreement and due diligence matters. Hall, II Tr. at 882-83, 888-89.
It was against this background that a committee of the Costain Board of Directors met in London on the 19th to decide what to do. Costain was concerned that it could not afford any further delay in the announcement of the sale of the Australian assets. Costain's Post-Trial Proposed Findings of Fact at 36-37. At this time the banks were becoming increasingly concerned about Costain's position and at the end of that week Costain needed to have *1409 bank approval to make a payment to refinance the Spitalfield Project. Sawdy, II Tr. at 1054; Hampson, II Tr. at 1304-07. Because Costain's highest priority at that point was certainty, it decided to sign with Peabody, officially recording its decision in the minutes of the assets disposal committee. Costain's Post-Trial Proposed Findings of Fact at 37 (citations omitted). The Peabody Share Purchase Agreement (hereinafter "SPA") was executed on the evening of October 19, formally sealed and placed in escrow to take effect as of October 20, 1992.
After Costain made its decision to sign with Peabody, the Altus representatives were so informed. In the evening of October 19, Mr. Costain called Mr. Biamonti to let him know that Costain had signed with Peabody. Mr. Biamonti then informed Mr. Paquin that evening. Early in the morning of October 20, Mr. Costain telephoned Mr. Paquin personally to inform him that the board had chosen Peabody. There was no discussion during that conversation of Altus making a further bid for the Australian coal business.
The SPA between Peabody and Costain contains a "fiduciary out" clause, § 4.1(d). Pl.Ex. 7. Section 4.1(d) provides in full as follows:
(d) Other Proposals. Until the Closing or the termination of this Agreement in accordance with Article XI (whichever occurs first), in the case of the Shares, the shares of CRL or of any other Subsidiary of CRL or any portion of the business conducted by CRL or any other Subsidiary of CRL (the "Business"), except as specifically permitted under this Agreement, neither the Seller nor any of its affiliates, nor any of their respective employees, officers, directors, agents or other representatives, directly or indirectly, shall (i) initiate contact with any person or entity in an effort to solicit any proposal to purchase the Business, (ii) furnish or cause to be furnished any non-public information concerning the Business in connection with any proposal to purchase some or all of the Business (other than to the Buyer or any affiliate thereof), (iii) negotiate with any person or entity (other than the Buyer or any affiliate thereof), with respect to any proposal to purchase the Business, or (iv) enter into any agreement or understanding for a sale of the Business (other than with the Buyer or any affiliate thereof); provided, that the foregoing shall not prohibit the Seller or any other person referred to above from taking any action described in clauses (ii) through (iv) above, in response to an unsolicited proposal, if in the Seller's good faith judgment (after taking legal advice from its external solicitors) such action is required by applicable Law, by the fiduciary duties of the Seller's directors, or by the City Code on Takeovers and Mergers. If the Directors of the Seller shall, because of the prospect of a transaction with a third party for the purchase of some or all of the Business (and pursuant to the Seller's good faith judgment (after taking legal advice from its external solicitors) that such action is required by applicable Law, by the fiduciary duties of the Seller's directors, or by the City Code on Takeovers and Mergers), not approve and recommend to their respective shareholders this Agreement and the indemnities described herein or withdraw or revoke such approval and/or recommendation; and thereafter this Agreement shall not be consummated, then, the Seller shall pay to the Buyer, on demand, as a termination fee and liquidated damages (and not as a penalty), an amount in cash equal to US$5,000,000. In the event the conditions in the preceding sentence are satisfied, the parties agree that the damages that would be suffered by the Buyer are speculative and uncertain and are not capable of being readily ascertained. The parties agree that the US$5,000,000 amount is a reasonable and good faith estimate of such damages. For purposes of this Section 4.1(d), the acquisition or the potential acquisition of all of the outstanding ordinary shares of the Seller shall not be deemed to constitute the purchase of some or all of the Business.
Pl.Ex. 7.
On October 20, 1992, Messrs. Paquin and Biamonti discussed the window of opportunity *1410 created by the need for shareholder approval of the Peabody deal. The discussed the fact that "because of the importance of the deal, it had to be put to shareholders approval" and that "British boards, under fiduciary duty, held the last moment to actually listen to third party offers." Paquin Dep. at 25. They also discussed the possibility that if Altus agreed to buy Costain's Australian real estate assets, which Peabody was not buying, as well as the coal assets, it might make a difference to Costain. Biamonti suggested that Paquin telephone Mr. Costain and find out if the addition of real estate would make a difference.
Mr. Paquin called Mr. Costain late on October 20 and told him that Altus thought that it could make "an offer for real estate, maybe, and inquired as to Mr. Costain's position." Paquin Dep. at 27-28. Mr. Costain responded that he heard what Mr. Paquin was saying, but that he was not prepared to discuss the matter with Mr. Paquin without seeking advice from his external counsel. Mr. Costain immediately consulted with Costain's external solicitors and also set a meeting with his outside lawyers for October 22. After calling Mr. Costain, Mr. Paquin contacted Mr. Humphris and stated that Altus was "not happy to accept defeat in this issue and [Altus was] going to look to see if they could submit an alternative offer." Humphris Dep. at 114.
Additionally, on October 20, Costain's external solicitor, Richard Hall of Slaughter & May, telephoned Altus' external solicitor, Michael Johns, to say "hard luck." Mr. Johns replied in kind, saying that he had enjoyed negotiating with Mr. Hall even though "he had always felt it unlikely that it would ever come to anything." Hall, II Tr. at 910. During the conversation, Mr. Johns asked whether the Peabody contract "contained language concerning fiduciary duties similar to that which had been contained in the draft Altus contract as it had been left over the weekend." Hall, II Tr. at 910. Mr. Hall responded that he "did not think it appropriate to discuss the detailed terms of the contract," but that he "thought [Mr. Johns] already knew that the Altus contract had, in its short stages, been structured on the basis of the Peabody contract as it then stood." Hall, II Tr. at 910.
Mr. Costain met with Mr. Hall and Peter Nicoll, Costain's Group Legal Advisor on October 20. Mr. Hall advised Mr. Costain that he must do nothing "until we had given the matter very, very careful thought, he must not initiate any contact with the French in terms of meetings and telephone calls." Hall, II Tr. at 917-918. "I think we did say that he was allowed to receive telephone calls and listen if any calls came through." Hall, II Tr. at 918.
Peter Costain asked Mr. Nicoll and myself to give it very careful thought and to meet with him later in the week to consider the implications of the French proposal within the context of 4.1(d). We equally admonished Mr. Costain that we would need to sit down with him at that meeting and take him through, in the utmost detail, his diary of events from the very beginning of the talks on Australian matters to establish that there could be no question there had been any initiation of contact on his part.
Hall, II Tr. at 919.
On October 21, 1992, Mr. Johns telephoned Mr. Hall and told him that Altus was interested in making another offer that included both the coal mining interests and Costain's commercial real estate in Australia. Mr. Hall told Mr. Johns that he "had been made aware the previous afternoon that such a proposal had been received, but ... had advised Peter Costain that we were not in the position to respond to it in any way at that time." Hall, II Tr. at 929. Mr. Hall also said that he had been instructed to write to Mr. Johns "setting out ... the ground rules for any continuing exchanges between us." Hall, II Tr. at 929. On October 23, Mr. Hall sent a letter to Mr. Johns regarding their phone conversation. Pl.Ex. 207. In the letter Mr. Hall stated:
When you rang me on Wednesday, you intimated that your client might make a further proposal to Costain in relation to its Australian coal-mining business *1411 ("Australia"); you mentioned that this would be communicated direct to Peter Costain. For the record, it is my understanding that, as previously, your client's approach would be unsolicited.
You will appreciate that Costain is now contractually bound to sell Australia to Peabody. However, the Directors of Costain of course have a fiduciary duty in all matters to act in the best interests of Costain and its shareholders; this is of relevance both to their response to any alternative proposal and to any recommendation to be made to shareholders in the context of a resolution to approve the disposal of Peabody.
* * * * * *
Before any further proposal is made by your client, I would ask that you advise him of these constraints and that any further approach by your client recognizes the firm intention of Costain and its directors to respect, and act in strict accordance with, the Company's contractual obligations.
Pl.Ex. 207. Mr. Johns responded on October 23 with a letter to Mr. Hall in which he stated that he could "confirm that my clients approach to yours is unsolicited." Pl.Ex. 207.
On October 22, Mr. Costain met with Mr. Hall and Mr. Nicoll for two hours to discuss the chronology of events. Mr. Hall and Mr. Nicoll testified that during that meeting, Mr. Hall questioned Mr. Costain at length about Costain's contacts with Altus. They further testified that Mr. Hall advised that he believed that Costain had not solicited Altus and that § 4.1(d) did not prohibit a meeting with Altus. The draft notes prepared by Mr. Nicoll, however, would seem to indicate that the contacts discussed all occurred prior to the signing of the Peabody SPA on October 20. Def. Ex. 10T. Finally, Mr. Hall testified that on October 22, he advised Costain that it could properly give Altus non-public information regarding the real estate assets because those assets were not part of the business being sold to Peabody pursuant to the SPA.
Before meeting with Altus, Mr. Costain discussed the situation with Costain's chairman, Peter Sawdy and Costain's finance director, Thomas Slee. The three men, who constituted the board's disposals committee, agreed that Mr. Costain could meet with Altus and give Altus information about the real estate assets. Mr. Costain met with Mr. Paquin the following day, October 23. At that meeting, Peter Costain gave Mr. Paquin the list of commercial Australian properties that were not part of the Peabody transaction and related valuation information. Mr. Paquin testified at deposition that Mr. Costain did not discuss the Australian coal assets at that meeting. Mr. Costain, however, testified that he believed that Mr. Paquin's offer on October 20 was to make a new offer for the combined coal and commercial property. Costain, I Tr. at 352-53. Mr. Costain further testified that in practice, he believed that Mr. Paquin was therefore making use of the information provided to ultimately make a combined offer. Costain, I Tr. at 353. Mr. Costain stated that he could not say what was in Mr. Paquin's mind when he actually gave him the information other than the fact that he saw it was "directly related to the offer Mr. Paquin made, in essence, in the afternoon of the 20th of October," which Mr. Costain believed involved both the Australian coal and commercial property. Costain, I Tr. at 353. See also Costain, I Tr. at 307, Costain's Post-Trial Proposed Findings of Fact at pp. 44-45 n. 24.
On October 23, Mr. Hall also learned that CLS had requested certain information about the balance sheets of the Australian business which pertained to the coal assets and real estate. Mr. Hall testified that he called Mr. Johns later that day and informed him that Costain would not allow Altus to see the information because it might be covered by the SPA restrictions. During that conversation, the notes of Mr. Nicoll indicate that CLS advised Nicoll that they would be "dropping a line" to "formally" say they were interested in including the real estate properties and "bundling it together" with the coal business. Nicoll Dep. at 165. According to Nicoll's notes, CLS then pointed out that it was "important" *1412 that CLS "formally apply to pursue" the property, making express reference to § 4.1(d). Nicoll Dep. at 166.
On October 26, 1992, Slaughter & May, with Costain's approval, retained a barrister, Nicholas Strauss, QC, to assist it in analyzing § 4.1(d). Mr. Hall provided Mr. Strauss with documents for his review. These documents were: (1) the July 2nd confidentiality undertaking; (2) the September 3rd letter from Peabody to Goldman containing Peabody's expression of interest; (3) Costain's response agreeing to provide a period of exclusivity; (4) the October 7th letter from Costain purporting to end exclusivity, Peabody's response on October 8th, and Costain's reply on October 9th; (5) the October 20 SPA; (6) a draft note prepared by Mr. Nicoll regarding the October 22 meeting with Mr. Costain; (7) a note of the telephone conversation between Mr. Nicoll and Mayer, Brown & Platt, Costain's American legal advisers, on October 15th; (8) an October 16th note detailing issues to be considered by Costain's Board in determining whether to pursue an alternative offer; and (9) the October 23 letter from Mr. Hall to Mr. Johns. Def.Ex. 10F. The only documents provided to Mr. Strauss which were created after the October 20 SPA were the draft note regarding the October 22 meeting and the October 23 letter. The October 22 draft note which was created regarding the October 22 meeting with Mr. Costain contains no reference to any activities between Altus and Costain which occurred after the SPA was executed. Def.Ex. 10T. The October 23 letter was from Mr. Hall to Mr. Jones and is previously quoted in part in the findings of fact. See Pl.Ex. 207.
On October 27, Altus made a formal written offer, stating that it would pay US $245 million for all of Costain's Australian assets, including the coal assets subject to the SPA. The Altus offer differed from the Peabody offer in that it disposed of Costain's Australian real estate; provided Costain with an additional $45 million in cash; and permitted Costain to completely exit Australia. On the morning of October 28, a special committee of the Costain Board met its legal and financial advisors. Mr. Hall reported that there would be a lawyers' meeting later that afternoon to evaluate the company's position in regards to § 4.1(d). Costain then scheduled a November 2 meeting of its full Board of Directors to obtain formal legal advice and to decide whether it had a duty to negotiate with Altus in response to its new offer. Mr. Sawdy requested that papers be prepared for the Board's consideration prior to that meeting.
Later on October 28, Mr. Nicoll met with Mr. Hall, several of his colleagues from Slaughter & May, and Mr. Strauss. The notes prepared after the conference indicate that the participants agreed that § 4.1(d) established a subjective, good faith standard for the directors' decision. Pl.Ex. 207. They also agreed that if after considering all of the relevant factors, the directors concluded that the Altus offer was clearly in the best interest of the shareholders, then the directors would be obligated to act upon it. The notes further indicate that counsel opined that if "the negotiations did appear to have been solicited by Costain, Peabody would have very good prospects of succeeding in gaining injunctive relief." Pl.Ex. 207. The notes indicate that "[i]t was considered crucial by Counsel that Costain establish that such negotiations were unsolicited since if that were not the case, Costain could not rely on this clause." Pl.Ex. 207.
During the course of the meeting, the lawyers also discussed whether a failure to notify Peabody of the discussions with Altus could give Peabody an argument that Costain had breached the good faith obligation set forth in § 12.23 of the SPA. All of the participants agreed that § 12.23 could not be used to imply a contractual obligation into § 4.1(d) to disclose post-contract approaches from a third party. Mr. Strauss opined that silence as to Peabody would not be a breach of the SPA. He nevertheless warned that silence might count against Costain in an equitable proceeding.
After the October 28 conference, Mr. Strauss and Mr. Hall, Costain's external solicitor, continued to discuss the risks *1413 posed by proceeding with Altus. On October 29, Mr. Strauss telephoned Mr. Hall to say that he had identified a possible alternate construction of § 4.1(d) under which the directors would not be permitted to proceed with a superior proposal. Mr. Strauss gave the argument only a one-in-four chance of success. Def.Ex. 10J. Mr. Hall thought that Mr. Strauss' after-thought rendered the fiduciary out clause meaningless and "was nonsense." Hall, II Tr. at 1250-51. Mr. Hall testified that Mr. Strauss ultimately came to the same conclusion. Hall, II Tr. at 1251. In a handwritten note that day to R.D. Humphris, Peter Hill stated that "[w]e are putting together the Board Paper tomorrow." Pl. Ex. 141. "The QC [Nicholas Strauss] backtracked this morning, but now seems to have been brought back (generally) into line." Pl.Ex. 141.
On October 30, Costain's solicitors issued an opinion, for consideration at the Costain Group Board meeting on November 2, 1992, that Costain could provide information to and negotiate with Altus under the terms of § 4.1(d) of the SPA. Def.Ex. BB. In that memorandum, Slaughter & May did not opine as to whether or not the Altus proposal had in fact been "unsolicited" within the meaning of § 4.1(d). The memorandum states that the "advice assumes:  (i) that the Altus proposal is unsolicited; ...." Def.Ex. BB. Mr. Hall has testified that he could not opine on such a fact issue. The Board members were also provided with: a letter from Mr. Costain; a memorandum from Mr. Hill comparing the commercial terms; Morgan Grenfell's analysis; and an October 27 memorandum from Mayer, Brown & Platt on the risks of litigation in the United States. Def.Ex. BB.
On November 2, Costain's Board of Directors voted to pursue a possible transaction with Altus based upon the October 27 proposal from Altus. Mr. Hall testified that the board, with the help of its advisors, considered the legal and commercial issues from every angle, including the risks of litigation. Mr. Costain assured the Board that the new Altus offer was unsolicited. Costain, I Tr. at 313-15; 318-19. Mr. Hall told the board that it was his opinion that the Altus proposal was "unsolicited" within the meaning of § 4.1(d). The Board, after considering the issues, resolved to negotiate with Altus.
Costain negotiated intensively with Altus from November 2 to November 6. On November 6, the Costain Board met once again with its key advisors to decide whether to sign the agreement with Altus. Prior to the meeting, the chairman, Mr. Sawdy, spoke to each board member who could not attend and obtained their views. There was another discussion concerning the negotiations with Altus, the relative merits of the deals, the risks of litigation, and the Board's contractual rights and fiduciary duties to its shareholders. Mr. Slee expressed reservations about going forward with the Altus proposal. His concerns were mostly that there would be delay if there was litigation, and if there was delay, it would very seriously affect Costain's cash position. Slee Dep. at 52. At the end of the discussion, the solicitors advised and the Board unanimously concluded that it had a fiduciary duty to its shareholders to approve and sign the Altus contract.
The Board ultimately decided to sign the Altus agreement. Costain made sure that its agreement with Altus had a broad "fiduciary out" clause. Like § 4.1(d) of the SPA, the Altus fiduciary out clause allows Costain to respond to unsolicited proposals from other prospective buyers and unlike the Peabody contract, the Altus contract specifically allows Costain to solicit proposals from Peabody. In early December, Costain distributed a circular to its common shareholders which described the background to the sale, discussed and compared the Peabody and Altus offers and provisions of each contract, told the shareholders about this lawsuit, and assured them that with the sale to Altus, Costain would have sufficient working capital. On December 22, Costain's shareholders met and approved the Altus transaction.
The Peabody SPA provides in § 12.3 that:
This Agreement, together with the Deed of Tax Covenant and that certain Confidentiality *1414 Agreement, dated July 2, 1992, between the Buyer and the Seller (the "Confidentiality Agreement"), constitute the entire agreement and supersede all prior agreements and understandings, written or oral, between the parties hereto with respect to the subject matter hereof. There have been no representations or statements, oral or written, that have been relied on by any party hereto, except those expressly set forth in this Agreement (including the Schedules and Exhibits hereto) and the Confidentiality Agreement.
Pl.Ex. 7. The SPA further provides in § 12.17 that "[t]his Agreement shall be governed by and construed in accordance with English law." Pl.Ex. 7.
The Peabody SPA provides in § 12.19 that:
The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which they are entitled at law or in equity.
Pl.Ex. 7. CRL has a unique combination of equity interests in major existing and potential mining ventures such as Warkworth and Bengalla and contracts to mine coal in those and other sites which Peabody could not obtain elsewhere. If Costain is permanently enjoined from proceeding with the Altus transaction, Costain will face financial harm in the interim, prior to approval of the Peabody transaction or any other transaction, if the Peabody transaction is rejected.

II. CONCLUSIONS OF LAW
Prior to this Court's addressing of the merits of the case, there are evidentiary matters which must be addressed. Several objections to documentary evidence were taken with the case. The Court, therefore, must now rule upon these objections. Defendants objected to the introduction into evidence of plaintiffs' Exhibits 40, 49, 57, 64A, 64B, 64C, 64D, 64E, 64F, 64G, 64H, 83, 89, 98, 101, 102, 106, 110, 118, 121, 134, 141, 152, 162, 180, 195, 196, 207, 209, 224 and 337. These objections were all based upon relevancy, materiality, hearsay and privilege. Additionally, the objections to Exhibits 40, 224 and 337 were based upon formulation and authenticity. Plaintiffs objected to the introduction into evidence of defendants' Exhibits 4Z, 6W, 7E, 8D, 9U. Additionally, several objections were made by both parties to the introduction of deposition testimony. Defendants' objections to plaintiffs' Exhibit 195 is granted. Plaintiffs' objection to defendants' Exhibits 4Z and 9U are granted. The objections as to all other exhibits and deposition testimony are overruled. All of the admitted exhibits and deposition testimony are admitted to the extent that they are material and relevant to the issues addressed in this opinion, i.e. whether the Altus transaction was based upon an unsolicited proposal. This includes any background information necessary to address these claims. The documents are not admitted as relevant or material to the extent that they pertain solely to the claims which this Court has declined to address in this Memorandum.

A. Standards for Entry of a Permanent Injunction
The standard for determining whether a permanent injunction should issue is essentially the same as the standard for a preliminary injunction, except that the Court determines the plaintiff's success on the merits rather than the plaintiff's likelihood of success on the merits. Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987) (citation omitted); Gilleo v. City of Ladue, 774 F.Supp. 1564, 1566 (E.D.Mo.1991) (citation omitted). In so doing, the Court must determine whether defendants breached a contractual obligation for which such an injunction is an available and proper remedy. "The Court must also consider (1) whether the moving party will suffer irreparable *1415 injury absent the injunction; (2) the injury to the moving party as balanced against the harm to the other party should the injunction issue; and (3) the effect of the public interest." Gilleo, 774 F.Supp. at 1566 citing Dataphase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109, 113 (8th Cir.1981). The Peabody plaintiffs bear the burden of persuasion as to these matters.

B. Choice of Law
Section 12.17 provides that the "Agreement shall be governed by and construed in accordance with English Law." Pl.Ex. 7. Thus, English law applies to the issues of contract interpretation raised by the parties. The parties would appear to be in agreement with this conclusion because both sides have submitted to this Court affidavits from English law experts. In that Costain is a public limited company, English law also applies in defining the scope of the Costain directors' fiduciary duty and other obligations imposed by law.

C. Peabody Plaintiffs' Success on the Merits
Prior to the Court addressing plaintiffs' success on the merits of their claim that defendants breached the SPA with Peabody, the Court would like to address plaintiffs' claims of defendants' breach of confidentiality and exclusivity agreements. The confidentiality agreement and exclusivity agreement which plaintiffs contend defendants breached were both allegedly entered into prior to the completion of the SPA and any agreement as to the sale of the Australian coal properties. Plaintiffs, however, seek the issuance of a permanent injunction to enforce the SPA based not only upon defendants' breach of the SPA, but also upon defendants' alleged breach of the confidentiality and exclusivity agreements. It is the opinion of this Court that an alleged breach of the confidentiality or exclusivity agreements by defendants would not support the issuance of an injunction to enforce the terms of the SPA. Plaintiffs may seek monetary damages for any alleged breach of the exclusivity or confidentiality agreements, but are not entitled to the requested equitable relief for any alleged breach. This is based upon the conclusion that enforcement of these agreements by this Court would not entitle plaintiffs to enforce the SPA. Any findings of fact relating to the alleged creation or alleged breach of a confidentiality agreement or exclusivity agreement are simply provided as background facts to this Court's conclusions as to defendants' breach of the SPA. The facts presented on those issues, although still in dispute and unresolved, are relevant to the parties' ultimate actions with regards to the SPA. The Court, therefore, declines to find that the parties entered into or breached any disputed confidentiality agreements or exclusivity agreements prior to the execution of the SPA. The Court further declines to address defendants' argument that § 12.3 supersedes any previous agreements entered into between the parties. Thus, the Court's ruling is solely to conclude whether defendants' breached the SPA and whether such breach entitles plaintiffs to the issuance of a permanent injunction ordering defendants to terminate the pending Altus-Costain transaction.
Plaintiffs first argue that defendants breached the SPA through their breach of § 4.1(d) of the SPA. The first part of § 4.1(d) contains a list of prohibited acts. It provides that neither Costain nor any of its employees, agents or representatives shall, directly or indirectly,
(i) initiate contact with any person or entity in an effort to solicit any proposal to purchase the Business;
(ii) furnish or cause to be furnished any non-public information concerning the Business in connection with any proposal to purchase some or all of the Business [other than to Peabody];
(iii) negotiate with any person or entity [other than Peabody] with respect to any proposal to purchase the business; or,
(iv) enter into any agreement or understanding for a sale of the Business [other than with Peabody]....
Immediately following this list is a proviso which specifically allows Costain to take any of the actions described in clauses (ii) through (iv) above "in response to any unsolicited *1416 proposal, if in the Seller's good faith judgment (after taking legal advice from its external solicitors) such action is required by applicable Law, by the fiduciary duties of the Seller's directors, or by the City Code on Takeovers and Mergers." Pl. Ex. 7.
The prohibitions listed in § 4.1(d) are what is sometimes referred to as a "no shop" or a "window shop" clause, which limits the seller's ability to freely market the assets in question. The proviso in § 4.1(d) is what is commonly called a "fiduciary out" clause, a clause which is specifically designed to enable the seller to withdraw from the agreement in the event that a superior, unsolicited proposal is made.
The "fiduciary out" clause, giving Costain a limited right to terminate its contractual obligations upon the happening of certain carefully specified future events, is a condition subsequent, as to which Costain bears the burden of proof. A condition subsequent is a contingency stipulated in a contract which contemplates an "ipso facto cancellation [of the contract] on the happening or occurrence of a stipulated event or condition." 17A C.J.S. Contracts § 339, at 323 (1963). Furthermore, Corbin on Contracts provides that "[o]ne who asserts his discharge [of a contractual obligation] by reason of the exercise of such a power must show the fulfillment of the condition  the existence or occurrence of the fact or event constituting the condition." 6 A. Corbin, Corbin on Contracts, § 1266, at 56 (1962). See also Hildyard Affidavit No. 2, at ¶ 13.
Before turning to the specific application of § 4.1(d) to the facts surrounding the Altus proposal, it is necessary to address plaintiffs' contention that § 4.1(d) automatically excluded Costain from accepting any proposal from Altus, whether or not it was unsolicited. Plaintiffs argue that the term "unsolicited proposal" should be read to exclude any proposal from a party with whom Costain had previously been negotiating, absent an express provision such as the one provided in the Altus share purchase agreement. Alternatively, plaintiffs' English law expert, Mr. Henry Thoroton Hildyard, suggests that the Court should imply such a restriction based upon the parties' intent.
Under English law, as under American law, contracts are to be interpreted in accordance with their plain and ordinary meaning. The leading English treatise on contracts states that the "cardinal presumption is that the parties have intended what they have in fact said, so that their words must be construed as they stand." Chitty on Contracts, cited in Strauss Affidavit No. 3, ¶ 36. The treatise goes on to state:
That is to say, the meaning of the document or of a particular part of it is to be sought in the document itself "one must consider the meaning of the words used, not what one may guess to be the intention of the parties." [citation omitted]. However, no contract is made in a vacuum, in construing the document the court may resolve an ambiguity by looking at its commercial purpose and the factual background against which it was made....
Chitty on Contracts, cited in Strauss Affidavit No. 3, ¶ 36. It is the opinion of this Court that Peabody's argument that Costain was precluded from dealing with Altus is contrary to the plain language of § 4.1(d). The first part of § 4.1(d) prohibits Costain from providing information to, negotiating with or entering into an agreement with "any person or entity (other than the Buyer or an affiliate thereof)...." Pl.Ex. 7 (emphasis supplied). Once the proviso is applicable, however, Costain is specifically permitted to provide information to, negotiate with and enter into an agreement with any person or entity other than Peabody. Pl.Ex. 7. The provision does not specify that Costain may not accept an unsolicited offer from Altus or anyone with whom it had previously negotiated. Under the plain language of § 4.1(d) of the SPA, therefore, Costain was not automatically prohibited from accepting an unsolicited proposal from Altus pursuant to § 4.1(d).
Alternatively, plaintiffs suggest that this Court should imply such a restriction based upon the intent of the parties. *1417 Mr. Hildyard suggests that the Court imply something like the following statement after the proviso to § 4.1(d):
save in the case of a proposal from a person or entity (not being the Buyer) with whom the seller or any of its affiliates has had negotiations prior to this Agreement with respect to any proposal to purchase the Business....
Hildyard Affidavit No. 1, ¶ 9.(2). The Court disagrees with plaintiffs. It is very unusual for English courts, as it is for an American court, to imply a term into a heavily negotiated complex commercial agreement. Strauss Affidavit No. 2, ¶ 12(b). There is an initial presumption against such an implied term. Hildyard Affidavit No. 2, ¶ 12(b). This presumption is even stronger when there is an Entire Agreement clause, § 12.3, in the contract. Tatung (UK) Limited v. British Satellite Broadcasting Ltd., Lexis, slip op. at 12-13 (March 19, 1992). Furthermore, the implication of additional terms under English law is limited to situations where it is clear that both parties would have readily agreed that the implied term was intended if it had been raised during the negotiations. Strauss Affidavit No. 2, ¶ 12(a). In his affidavit, Mr. Nicholas Albert Strauss, defendants' English law expert, explains:
The test usually [applied] is known as the "officious bystander test": is what is sought to be implied "so obvious that it goes without saying; so that if while the parties are making their bargain, an officious bystander were to suggest some express provision for it in the agreement, they would testily suppress him with a common [']oh, of course[']": See Shirlaw v. Southern Foundries (1926) Limited [1939] 2 K.B. 206, 227 (the case was affirmed in the House of Lords [1940] A.C. 701).
Strauss Affidavit No. 2, ¶ 12(a). It is extremely doubtful, given Costain's negotiations with both Peabody and Altus prior to the Peabody SPA, that the parties, especially Costain, would suppress an officious bystander who suggested excluding any further offers from Altus with a common "oh, of course." This Court, therefore, will not imply a term to the proviso of § 4.1(d) of the SPA to prohibit any further unsolicited offers from parties which Costain had previously dealt with.
Thus, the Court must finally address the issue as to whether the agreement reached between Altus and Costain was based upon Costain's response to an "unsolicited proposal" from Altus, as is required by § 4.1(d) of the SPA. In doing so, the Court must determine what constitutes an "unsolicited proposal" within the meaning of § 4.1(d). The term is undefined in the SPA. Defendants argue that the drafters must have been referring back to the prohibition on solicitation in the first part of § 4.1(d), inasmuch as there is no other definition of "solicitation" in the contract. See Strauss Affidavit No. 2 at ¶ 10; Strauss Affidavit No. 3 at ¶¶ 70-71. Thus, defendants reason that if Costain did not violate that prohibition, that is, Costain did not "initiate contact with any person or entity in an effort to solicit any proposal to purchase the [Australian coal assets]", then any proposal received would, by definition, be unsolicited.
Plaintiffs suggest that solicitation is a term far broader than merely "initiating contact." Plaintiffs contend that the prohibition against solicitation should be construed as a prohibition against any form of encouragement by or on behalf of Costain at its behest or with its knowledge and approval, to any person or entity to make a proposal to purchase the Australian coal assets. "It is simply not plausible that parties should have agreed that Costain should be free to give any encouragement it wished to further proposals provided only it did not initiate contact with any specific offeror." Hildyard Affidavit No. 2, ¶ 19(a).
Plaintiffs argument would appear to be consistent with English law. In Stirling v. Maitland (1864) 5 B & S 841, Cockburn CJ stated:
I look on the law to be that if a party enters into an arrangement which can only take effect by reason of the continuance of a certain state of circumstances, there is an implied engagement on his *1418 part that he shall do nothing of his own motion to put an end to that state of circumstances, under which alone the arrangement can be operative.
Id. To allow a contracting party to encourage and cooperate in the development of a competing proposal is to leave it open to such a party to work for such a change of circumstances as will result in such frustration. Hildyard Affidavit No. 2, ¶ 19(a). The Court is not suggesting, however, that this conclusion implies a new term to the contract. Given the ambiguous and elusive nature of the terms "solicitation" and "unsolicited proposal," especially when neither are specifically defined in the SPA, English law and the commercial purpose and factual background should all be looked at in construing the document in order to resolve those ambiguities. See Strauss Affidavit No. 3, ¶ 36 citing Chitty on Contracts. Furthermore, defendants interpretation of the term "solicitation" as initiating contact with any person or entity in an effort to solicit a proposal to purchase the Australian coal assets would not be contradictory with plaintiffs' interpretation when the phrase, in its plain language, is read as a whole. The phrase "initiating contact ... in an effort to solicit a proposal," may easily, on its face, be construed to mean encourage any person or entity to make a proposal. The phrase, when read as a whole, is not so narrow as to be limited solely to circumstances when the defendants make the first or initial contact.
Thus, it is the opinion of this Court that the proviso which allows Costain to respond to an "unsolicited proposal" is limited to circumstances in which there was no form of encouragement by or on behalf of Costain, at its behest or with its knowledge and approval, to any person or entity, to make a proposal to purchase the Australian coal assets. With this standard in mind, the Court will now turn to an examination of the facts in the present case to determine whether the Altus agreement arose from Costain's response to an unsolicited proposal, as required in § 4.1(d) of the SPA.
The Court will first address the evidence relating to Altus' behavior subsequent to the execution of the Peabody SPA. On October 20, Mr. Paquin called Mr. Costain and told him that Altus thought it could make "an offer for real estate, maybe, and inquired as to Mr. Costain's position." Paquin Dep. at 27-28. After calling Mr. Costain, Mr. Paquin contacted Mr. Humphris and stated that Altus was "not happy to accept defeat in this issue and [was] going to look to see if they could submit an alternative offer." Humphris Dep. at 114. On the same day, Mr. Johns, spoke with Mr. Hall on the telephone and Mr. Johns inquired as to whether there was a "fiduciary out" clause in the Peabody SPA. On October 21, Mr. Johns telephoned Mr. Hall and informed him that Altus was interested in making another offer that included both the coal mining interests and Costain's commercial real estate in Australia. A letter written by Mr. Hall, referencing that conversation, stated that "[w]hen you rang me on Wednesday, you intimated that your client might make a further proposal to Costain in relation to its Australian coal mining business...." Pl.Ex. 207 (emphasis supplied). During a phone conversation on October 23, the notes of Mr. Nicoll indicate that CLS advised Nicoll that they would be "dropping a line" to "formally" say they were interested in including the real estate properties and "bundling it together" with the coal business. Nicoll Dep. at 165. Finally, on October 27, 1993, Altus made a formal written offer to Costain for all of Costain's Australian assets, including the coal assets subject to the SPA.
This evidence indicates that Altus did not make a proposal to Costain until October 27, 1992. All of the activity by Altus or its agents leading up to October 27 indicate that Altus was considering making a proposal on the combined assets. There was no action taken by Altus or its agents prior to the October 27 offer which would indicate a firm interest or commitment in the Australian coal properties. Mr. Paquin did not even refer to the Australian coal properties in the October 20 phone call in which he expressed an interest in the Australian *1419 commercial real estate. Thus, it is the opinion of this Court that Altus made a proposal to Costain for the Australian coal properties on October 27, 1992.
The Court would like to note in making this conclusion, the Court is not relying upon plaintiffs' argument that the proposal must be a firm offer. The Court agrees with defendants' argument that Altus could make a proposal without making a firm, written offer. Based upon the evidence in the present case, however, Altus did not make a proposal or an offer prior to October 27. Prior to that date, Altus' conduct indicates that they were merely considering making such an offer or proposal.
Next, the Court must address whether the proposal made by Altus on October 27 was unsolicited within the terms of § 4.1(d) of the SPA. Thus, the Court must determine whether there was any form of encouragement by or on behalf of Costain, at its behest or with its knowledge and approval, to any person or entity, to make a proposal to purchase the Australian coal assets. On October 20, Mr. Hall, in his conversation with Mr. Johns, informed Mr. Johns that there was a "fiduciary out" clause similar to the one in the Altus contract. Mr. Johns asked Mr. Hall about this, but Mr. Hall was in no way obligated to inform him that there was. During the phone conversation with Mr. Johns on October 21, Mr. Hall stated that he had been instructed to write to Mr. Johns "setting out ... the ground rules for any continuing exchanges between us." Hall, II Tr. at 929. On October 23, 1992, Mr. Hall sent the letter to Mr. Johns and set out what the Board of Directors' considerations would be in considering any further proposals from Altus. The letter stated:
You will appreciate that Costain is now contractually bound to sell Australia to Peabody. However, the Directors of Costain of course have a fiduciary duty in all matters to act in the best interests of Costain and its shareholders; that is of relevance both to their response to any alternative proposal and to any recommendation to be made to shareholders in the context of a resolution to approve the disposal of Peabody.
Pl.Ex. 207. That same day, Mr. Costain met with Mr. Paquin to supply him with information concerning the Australian commercial real estate. At that time, although Mr. Paquin had an interest in making a combined offer for both the coal properties and the commercial real estate, he had not expressed it to Mr. Costain. Mr. Costain, however, was under the assumption that Mr. Paquin was interested in both of the properties when he spoke to him on October 20. Mr. Costain testified that in practice, he believed that Mr. Paquin was making use of the information provided by Mr. Costain to ultimately make a combined offer. Costain, I Tr. at 353. Mr. Costain further stated that he could not say what was in Mr. Paquin's mind when he actually gave him the information other than the fact that he saw that it was "directly related to the offer Mr. Paquin made, in essence, in the afternoon of the 20th of October," which Mr. Costain believed to involve both the Australian coal and commercial property. Costain, I Tr. at 353.
This evidence indicates that there was encouragement by or on behalf of Costain, at its behest or with its knowledge and approval, to Altus or its agents, to make a proposal to purchase the Australian coal assets. Altus then did, in fact, make such a proposal on October 27, 1992. This is especially true when placed in the context of the previous negotiations with Altus. Costain had been negotiating with Altus at the same time it was negotiating with Peabody prior to the execution of the Peabody SPA on October 19. The Peabody SPA, an agreement which was $15 million less than the proposed Altus transaction, was accepted and executed at a time when Costain was facing financial difficulties and was looking for certainty. Less than twenty-four hours elapsed between the time the Peabody SPA was executed and conversations between Altus and Costain resumed. Based upon English law and the terms of § 4.1(d) of the SPA, the share purchase agreement entered into between Altus and Costain was not the result of an "unsolicited proposal," as required by § 4.1(d) of the SPA.
*1420 This finding is further supported by evidence which would indicate that Costain expressed an interest in actively negotiating with Altus for a proposal, while at the same time making it clear to Altus that they could not be viewed as soliciting such a proposal. In the October 23 letter from Mr. Hall to Mr. Johns which Mr. Hall had stated, in a previous telephone conversation, was for the purpose of setting out the ground rules for any continuing exchanges between the parties, Mr. Hall stated: "For the record, it is my understanding that, as previously, your client's approach would be unsolicited." Pl.Ex. 207; Hall, II Tr. at 929. Furthermore, on October 20, Mr. Nicoll and Mr. Hall:
equally admonished Mr. Costain that we would need to sit down with him at [the October 22] meeting and take him through, in the utmost detail, his diary of events from the very beginning of the talks on Australian matters to establish that there could be no question there had been any initiation of contact on his part.
Hall, II Tr. at 919. Finally, the notes of the October 28 lawyers' meeting indicate that "[i]t was considered crucial by Counsel that Costain establish that such negotiations were unsolicited since if that were not the case, Costain could not rely on this clause." Pl.Ex. 207.
Defendants, therefore, have failed to meet their burden of proof that the Altus transaction was entered into in response to an unsolicited proposal. Thus, it is the opinion of this Court that Costain breached § 4.1(d) of the Peabody SPA because it entered into an agreement or understanding for the sale of the Australian coal assets with a party other than Peabody and did not do so in response to an unsolicited proposal in that the evidence indicates the Altus made a proposal to Costain on October 27, 1992 and prior to that date, Costain or its agents encouraged Altus or its agents to make a proposal to purchase the Australian coal assets. Assuming, arguendo, that English law does not place the burden of proof that the proposal was unsolicited upon defendants, plaintiffs have presented sufficient evidence to meet that burden of proof and ultimately the burden of persuasion that there was no "unsolicited proposal," and that there was a breach of contract under the terms of § 4.1(d) of the SPA.
In light of this Court's finding of plaintiffs' success on the merits of their claim of defendants' breach of the § 4.1(d) provision by entering into an agreement that was not in response to an unsolicited proposal, the Court declines to address plaintiffs' claims that defendants breached the SPA by: (1) providing non-public information concerning the Australian coal business to Altus in breach of § 4.1(d); (2) failing to act in "good faith" in breach of § 12.23 of the SPA; and (3) failing to seek shareholder approval as required by § 4.1(g) of the SPA. The Court further declines to address Costain's argument that it had a fiduciary duty to proceed with the Altus transaction because this argument is only relevant if Costain entered into the transaction in response to an "unsolicited proposal."
Finally, the Court must address defendants' argument that plaintiffs are not entitled to injunctive relief in the present action because Costain has an absolute right to terminate the SPA. Section 11.1 of the SPA provides, in relevant part:
Section 11.1 Termination. This Agreement may be terminated by written notice stating the reasons therefor at any time prior to the Closing:
* * * * * *
(b) By the Seller if any of the conditions set forth in Article VI shall not have been satisfied on or before January 15, 1993, and the Seller shall not have waived such failure of satisfaction....
Pl.Ex. 7. It is undisputed that one of the conditions to closing set forth in Article VI, approval of the transaction by Costain's shareholders, was not satisfied on or before January 15, 1993 and that Costain has not waived that failure of satisfaction.
It is, however, a "well established rule of English law that a contract cannot be brought to an end by self-induced frustration." Hildyard Affidavit No. 2, ¶ 19(d). In New Zealand Shipping Co., Ltd. v. Societe *1421 des Ateliers et Chantiers de France, [1919] A.C. 1, Lord Atkinson stated:
It is undoubtedly competent for the two parties to a contract to stipulate by a clause that the contract shall be void upon the happening of an event over which neither of the parties shall have any control, cannot bring about, prevent or retard.... But if the stipulation be that the contract shall be void on the happening of an event which one or either of them can by his own act or omission bring about, then the party, who by his act or omission brings that event about, cannot be permitted either to insist upon the stipulation himself or to compel the other party, who is blameless, to insist upon it, because to permit the blameable party to do either would be to permit him to take advantage of his own wrong, in the one case directly, and in the other case indirectly in a roundabout way, but in either way putting an end to the contract.
Id. Furthermore, defendants cite to the Strauss Affidavit No. 3, ¶ 154 in which Mr. Strauss states that "[a]n English court would not, in the exercise of its discretion, grant an injunction if, by reason of the defendant's right to terminate the contract, it would be futile to do so." Not only is there no right by the defendant to terminate the contract in the present circumstances, it is questionable whether it would be futile for the Court to grant an injunction. It is unclear whether the shareholders will approve or disapprove the Peabody transaction. It is unclear, therefore, that it would be futile to grant an injunction.

D. Peabody's Irreparable Harm
In § 12.19 of the SPA, Costain expressly acknowledged "irreparable damage" to Peabody in the event of breach and Peabody's entitlement to injunctive relief. In addition to the terms of the SPA, Peabody by independent evidence has demonstrated irreparable harm. In this Court, the threshold inquiry on a request for injunctive relief is whether "the movant has shown the threat of irreparable injury." Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir.1987). Improper conduct for which monetary remedies cannot provide adequate compensation suffices to establish such harm. Paulsen v. County of Nassau, 925 F.2d 65, 68 (2d Cir.1991) (citation omitted). Plaintiff need not show that damages have accrued, only that there is a threat of irreparable harm absent injunctive relief. Sigma Chemical Co. v. Harris, 586 F.Supp. 704, 710 (E.D.Mo. 1984).
Many authorities acknowledge the inherent uniqueness of a company sought to be acquired, and the irreparable harm suffered by the party acquiring the company by the loss of the opportunity to own or control that business. See Associated Producers Co. v. City of Independence, Missouri, 648 F.Supp. 1255, 1262-63 (W.D.Mo. 1986); Meis v. Sanitas Service Corp., 511 F.2d 655, 657 (5th Cir.1975); Local Lodge No. 1266 v. Panoramic Corp., 668 F.2d 276, 287-89 (7th Cir.1981); see also San Francisco Real Estate Investors v. Real Estate Investment Trust of America, 701 F.2d 1000, 1003 (1st Cir.1983); Icahn v. Blunt, 612 F.Supp. 1400, 1420-21 (W.D.Mo. 1985).
Costain's Australian coal businesses are unique, including the management contracts and equity interests in existing and potential mining properties, and Peabody, particularly because of its existing business and relationships, plainly will suffer irreparable harm if the SPA is breached. Monetary damages cannot compensate for the injury Peabody would experience.
Defendants argue, however, that the $5 million liquidated damages provision in § 4.1(d) of the SPA provides a reasonable estimate of the damages Peabody would suffer. The Court disagrees with defendants. It is clear, plainly on the face of § 4.1(d) of the SPA, that the liquidated damages provision applies only to situations where no sale is consummated between Peabody and Costain based solely upon the existence of an unsolicited proposal which is superior to Peabody's. In such a circumstance, Peabody has protected itself in case it cannot meet the superior offer. This does not mean, however, that the provision states an adequate remedy *1422 for circumstances where there is no unsolicited bid superior to Peabody's and Costain has breached the SPA. Peabody needs no monetary protection in such a circumstance because Costain has no right to terminate the contract in pursuit of the better unsolicited offer. Thus, it is the opinion of this Court that Peabody will suffer irreparable harm if the Altus transaction were allowed to consummate.

E. The Balance of Equities
In order to obtain injunctive relief, plaintiffs need only show that the balance of equities tips in their favor. Dataphase Systems, 640 F.2d at 113-14. The balance of the equities decidedly tips in favor of Peabody. As previously stated, Peabody would lose the unique opportunity of owning and operating Costain's existing and substantial coal operation in a market which Peabody representatives have testified is of enormous strategic importance to Peabody.
In the long term, entry of an injunction will not provide any substantial harm to Costain. Peabody is willing and able to proceed with the transaction pursuant to the SPA. Costain will be able to proceed with the Peabody transaction, which it had previously agreed to, or another transaction if the Peabody transaction is rejected by Costain's shareholders. In the short term, Costain may suffer some financial harm pending the completion of the Peabody, or an alternative, transaction. Costain, however, clearly recognized this risk prior to proceeding with the Altus transaction. Costain's directors and lawyers spent a great deal of time analyzing the threats associated with the signing of the Altus transaction. See pp. 19-23; see also Slee Dep. at 52. It is, therefore, the opinion of this Court that the balance of equities tip in Peabody's favor.

F. Public Interest
The final factor this Court must consider in determining whether injunctive relief is appropriate is the public interest. Although the present action involves private parties, to the extent public interests are involved, they support entry of an injunction. The Court's enjoining of completion of the Altus transaction, in light of Costain's breach of the Peabody SPA, is clearly not against the public policy. There is no public policy to uphold breaches of such a contract. Thus, a permanent injunction in this action is wholly supported by public policy considerations.

G. Permanent Injunction
Based upon the following, it is the opinion of this Court that plaintiffs have succeeded in demonstrating that each of the four factors cited in Dataphase, 640 F.2d at 114, are present in the above-styled cause. A permanent injunction should issue, therefore, permanently enjoining defendants and their respective officers, directors, employees, agents or other representatives from selling, conveying, or otherwise transferring or closing any transaction for the sale of the issued capital shares of Richard Costain (Holdings) Limited to Altus Finance S.A., or to any person or entity with which Altus may be involved, which includes the sale of any Australian coal properties or coal business in Australia owned directly, or indirectly, by defendants or any one of them.

ORDER
In accordance with the Memorandum filed herein this day,
IT IS HEREBY ORDERED that plaintiffs' Motion for a Permanent Injunction is GRANTED.
IT IS FURTHER ORDERED that defendants' Motion to Modify or Dissolve the Preliminary Injunction is DENIED.
IT IS FINALLY ORDERED that defendants and their respective officers, directors, employees, agents or other representatives are permanently ENJOINED from selling, conveying, or otherwise transferring or closing any transaction for the sale of the issued capital shares of Richard Costain (Holdings) Limited to Altus Finance S.A., or to any person or entity with which Altus may be involved, which includes the sale of any Australian coal properties or coal business in Australia owned *1423 directly, or indirectly, by defendants or any one of them.